UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

LORI SILVERMAN and LSIL & CO., INC.,

              *Plaintiffs*,

-against-

ATTILIO GIUSTI LEOMBRUNI S.P.A., *et al.*

              *Defendants*.

-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/21/18

15 Civ. 2260 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Lori Silverman and her company Lsil & Co., Inc. initiated this action against Defendant Attilio Giusti Leombruni S.P.A. ("AGL"), alleging patent infringement, trademark infringement, and various state-law claims. AGL counterclaimed for tortious interference with contractual relationship and prospective business advantages. The Court dismissed Plaintiff's patent infringement claim on February 19, 2016. Subsequently, the parties stipulated to dismissal of the remainder of Plaintiffs' claims. The parties now cross-move for summary judgment on the sole remaining claim: AGL's counterclaim for tortious interference. Each party also moves for attorneys' fees. For the reasons that follow, Plaintiffs' motion is GRANTED IN PART as to summary judgment with respect to AGL's counterclaim, and DENIED as to all other motions.[1]

## BACKGROUND

On January 30, 2012, Plaintiffs applied to register a shoe sole design ("Camo Design") as

---

[1] Plaintiffs' motion is granted in part because Plaintiffs moved for summary judgment and for attorneys' fees in a single motion. *See* Notice of Motion, Dkt. 154.

a trademark on the Principal Register with the United States Patent and Trademark Office ("USPTO"). USPTO Decision, Yee Decl. Ex. 4. The Camo Design consists of "a camouflage design on the outsole of a high heeled shoe." *Id.* at 1. On May 8, 2012, the USPTO rejected Plaintiffs' application, explaining that the Camo Design "is merely a decorative or ornamental feature of the goods; it does not function as a trademark to identify and distinguish applicant's goods from those of others and to indicate the source of applicant's goods." *Id.* at 6. The USPTO recommended that Plaintiffs amend their application and register the Camo Design on the Supplemental Register instead. *Id.* The Camo Design was registered on the Supplemental Register on July 2, 2013. USPTO Trademark Reg. No. 4,362,523, Yee Decl. Ex. 1.

On March 5, 2015, Plaintiffs informed their counsel that they discovered that shoes with similar camouflage designs ("accused designs" or "accused products") were being designed by AGL and sold by Bloomingdale's and Nordstrom. 3/5/15 e-mail, Yee Decl. Ex. 14. On March 11, 2015, Plaintiffs' counsel sent cease-and-desist letters to AGL, Bloomingdale's and Nordstrom. Compl. Ex. 6; Answer Exs. 5, 6 ("Demand Letters"). On March 23, 2015, AGL sued Plaintiffs in the Central District of California ("California Court"), but the case was dismissed for lack of personal jurisdiction over Plaintiffs. *See* Joint Notice of Dismissal in California, Dkt. 14.

On March 25, 2015, Plaintiffs brought the present action against AGL, alleging federal trademark infringement and New York state law claims. *See* Compl., Dkt. 1. AGL counterclaimed for (1) declaratory judgment and (2) tortious interference with contractual relationship and prospective business advantages. *See* Answer, Dkt. 16. On October 6, 2015, United States Design Patent No. D740,005 ("005 Patent") was issued to Plaintiffs for the invention of "Shoe with Decorative Sole." 005 Patent, Yee Decl. Ex. 2. On November 12, 2015,

2

Plaintiffs amended their complaint to add a patent-infringement claim based on the 005 Patent. Amended Compl., Dkt. 27. On February 19, 2016, the Court dismissed the patent-infringement claim, holding that the patented and accused designs were "plainly dissimilar." Opinion and Order, Dkt. 53. Upon discovering that AGL had sold only $35,000 worth of shoes featuring the accused designs, Plaintiffs consented to dismissal with prejudice, and the Court dismissed the remainder of Plaintiffs' claims and AGL's first counterclaim on February 1, 2017. Order of Dismissal, Dkt. 96; 9/26/16 Letter, Dkt. 84. AGL, however, continued to pursue its counterclaims for tortious interference. Both parties now move for summary judgment on this counterclaim and for attorneys' fees.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Lanham Act provides that a court in "exceptional" trademark-infringement cases

3

may award reasonable attorneys' fees to the prevailing party. 15 U.S.C. § 1117(a). Attorneys' fees under the Lanham Act "should be awarded only on evidence of fraud or bad faith." *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993) (quotation marks omitted). Even so, "a finding of willfulness or bad faith does not automatically entitle the prevailing party to attorneys' fees." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 45 (S.D.N.Y. 2015). "Rather, the court should weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Id.* at 46 (quotation marks omitted).

With respect to patent-infringement claims, the Patent Act similarly provides that courts "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An "exceptional case" under the Patent Act is "one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

## II. Analysis

### A. Tortious Interference Claims

AGL argues that, by sending the Demand Letters, Plaintiffs tortiously interfered with AGL's contractual relationships and prospective business advantages with Bloomingdale's and Nordstrom. To prove tortious interference with contractual relations under New York law, AGL must show that: (1) it had valid contracts with Bloomingdale's and Nordstrom; (2) Plaintiffs had knowledge of the contracts; (3) Plaintiffs intentionally and improperly procured breaches of the

contracts; and (4) the breaches resulted in damage to AGL. *See Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996). To prove tortious interference with prospective business advantages, AGL must show that: (1) it had business relationships with Bloomingdale's and Nordstrom; (2) Plaintiffs knew of and intentionally interfered with that relationship; (3) Plaintiffs' interference amounts to "wrongful means"; and (4) Plaintiffs' interference caused injury to the relationships. *See Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 169 (S.D.N.Y. 2008) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)). Even assuming the first, second, and fourth elements are satisfied, however, AGL fails to satisfy the third element of each claim.

With respect to claims of tortious interference with contractual relations, a party improperly procures the breach of a contract when it acts "without reasonable justification or excuse." *Campbell v. Gates*, 141 N.E. 457, 460 (N.Y. 1923). As an initial matter, however, AGL fails to show that either Bloomingdale's or Nordstrom actually breached any existing contracts with AGL. AGL concedes that no written contracts existed, but insists that it had "at least an implied or 'at-will' contractual relationship [with Bloomingdale's and Nordstrom] based on their pattern of conducting business through purchase orders and invoices." AGL Sum. J. Mem., Dkt. 145, at 11. The only evidence of the content of such contracts comes from the declaration of Sara Giusti, one of AGL's shareholders. According to Giusti:

> It is common practice for Nordstrom to issue a "test" purchase order with AGL for a smaller quantity of a new product followed by an initial purchase order for a large volume of the product. It was understood between AGL, and Nordstrom and Bloomingdale's that the retailers would issue additional purchase orders within a few months after their initial orders for additional units of the Accused Products.

Giusti Decl. ¶4. Neither Bloomingdale's nor Nordstrom had any contractual *obligation* to place additional purchase orders. Presumably, the retailers could have decided against placing additional orders if they were dissatisfied with the "test" orders for any reason. That is the nature

5

of a "test." Because AGL fails to produce any evidence showing that Bloomingdale's or Nordstrom's decisions not to place additional orders breached a contract, AGL cannot show that Plaintiff improperly procured a breach of a contract.

With respect to the business advantages claim, "[t]he wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (citation omitted). For a party's interference with prospective business advantages to constitute "wrongful means," one of the following must be true: "(1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to 'extreme and unfair' economic pressure." *Friedman*, 551 F. Supp. 2d at 170 (citation omitted). AGL concedes that there is no independent crime or tort; rather, AGL contends that it fits within the second and third types of wrongful means.

AGL argues that Plaintiffs' conduct was taken solely out of malice because Plaintiffs must have known that they had no enforceable trademark rights in the Camo Design and that the Camo Design was clearly distinguishable from the accused designs. AGL argues that Plaintiffs must have been "on notice" of these facts because "[t]he USPTO repeatedly rejected Counter-Defendants' attempt to register the Camo Design on the Principal Register." AGL Summ. J. Mem. at 16.

The Camo Design was, however, placed on the Supplemental Register, which "entitles the owner of a mark to institute actions based upon it in the federal courts, and to obtain the remedies provided in the Lanham Act." *Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251, 257 (2d Cir. 1962) (internal citations omitted). Although registration on the Supplemental

6

Register "cannot give validity to a mark, the use of which would be invalid at common law," Plaintiffs could obtain the relief provided by the Lanham Act "if their marks are entitled to protection under common law—that is, if their marks are sufficiently distinctive to distinguish their goods from the goods of others." *C & L Intern. Trading Inc. v. Am. Tibetan Health Inst.*, Nos. 13-cv-2638, 13-cv-2763, 2013 WL 6086907, at *2-3 (S.D.N.Y. Nov. 19, 2013) (quoting *id.*). Such distinctiveness may be demonstrated if the mark either is "inherently distinctive" or has "acquired a 'secondary meaning' in the minds of consumers," such that "a purchaser will associate it with a certain producer." *Id.* at *3 (citations omitted).

Since Plaintiffs consented to dismissal of their Amended Complaint, the Court never ruled on these trademark-infringement issues. Although the Court dismissed the patent-infringement claim because the Camo Design and accused designs were "plainly dissimilar," it cannot say on this record that the Camo Design is not inherently distinctive, that it never acquired secondary meaning, or that Plaintiffs' separate claim for trademark infringement was frivolous. This trademark-infringement claim formed the basis of the Demand Letters. *See* Demand Letters ("Ms. Silverman has protected these designs with applications of design rights, a U.S. registered trademark for the CAMO sole on the Supplemental Register with exclusive and distinctive development of her rights over the last 3 ½ years."). Thus, the Court cannot find that Plaintiffs acted solely out of malice.

Nor can the Court say that the Demand Letters amounted to extreme and unfair economic pressure. AGL cites no authority suggesting that a cease-and-desist letter constitutes "economic pressure." Moreover, "for economic pressure to constitute wrongful means, such pressure must have been for the 'sole purpose of inflicting intentional harm on plaintiffs.'" *Catskill Dev.*, 547 F.3d at 136 (citation omitted). For the same reasons as above, the Court finds that Plaintiffs'

7

purpose was not solely to harm AGL, but also to protect "its own legitimate business interests." *See id.* Thus, AGL fails to satisfy the third element of each tortious interference claim, and so each claim fails. Accordingly, AGL's motion for summary judgment is denied and Plaintiffs' motion for summary judgment is granted.

**B.  Attorneys' Fees**

AGL argues that it is entitled to attorneys' fees because Plaintiffs commenced this action in bad faith and engaged in litigation misconduct. To prove bad faith, AGL repeats its prior arguments concerning malice, and it also contends that Plaintiffs failed to conduct an adequate pre-suit investigation. AGL contends that Plaintiffs engaged in litigation misconduct by: (1) submitting a declaration to the California Court falsely stating that Plaintiffs had no connection to California, resulting in the dismissal of that action; (2) submitting false declarations in this case to support their patent-infringement claim; and (3) delaying depositions and being evasive during them. Plaintiffs respond that they, not AGL, are entitled to attorneys' fees because AGL engaged in litigation misconduct, including (1) extending the case for over a year by failing to inform Plaintiffs that AGL sold only $35,000 worth of accused products; (2) extending the litigation further by maintaining a baseless claim for tortious interference; (3) making false statements about the locations of its offices and executives; and (4) taking unreasonable positions on deposition timing. The Court finds neither side deserving of attorneys' fees.

First, Plaintiffs' are not entitled to attorneys' fees under either statute because they are not a "prevailing party." 15 U.S.C. § 1117(a); 35 U.S.C. § 285. Their patent-infringement claim was dismissed for failure to state a claim, and they consented to dismissal of their trademark-infringement claim with prejudice. In no sense can they be considered a "prevailing party."

Second, AGL fails to prove that Plaintiffs conducted an inadequate pre-suit investigation.

8

The counsel who sent the Demand Letters on behalf of Plaintiffs had been advising Plaintiffs on their intellectual property rights since November 2011. Waldbaum Decl. ¶¶ 1-4. Plaintiffs' counsel has been litigating patent, trademark, and copyright cases since 1978, and he has co-authored a treatise on acquiring and protecting intellectual property rights. Waldbaum Decl. ¶ 12. Plaintiffs contacted counsel on March 5, 2015, and counsel sent the Demand Letters six days later. Before sending the Demand Letters, Plaintiffs' counsel discovered that Plaintiffs had given samples of their shoes to an Italian company acting as an agent of Nordstrom in 2014 and never received the samples back, suggesting that AGL may have copied the design. Walbaum Decl. ¶¶ 7-9. Indeed, Plaintiffs' counsel could find no other third party that had ever attempted to use substantially similar designs on such shoes. Waldbaum Decl. ¶¶ 6-9. Plaintiffs' counsel appeared to believe in good faith that he had a substantive legal case as well as a legal right to send cease-and-desist letters to an entity if he "believe[d] they infringed." *See* 9/29/16 Conf. Tr. at 14:1-4. AGL faults Plaintiffs' counsel for not realizing that Plaintiffs never conducted consumer surveys or sold many pairs of shoes. Although such factors are relevant to whether a mark has acquired secondary meaning, *see Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992), AGL points to no authority suggesting that such actions are necessary prerequisites to commencing suit. Thus, the Court declines to find bad faith.

Third, AGL's claims of litigation misconduct are exaggerated. For example, AGL contends that Plaintiff Silverman's statement to the California Court that "Lsil and I have never offered my designs for sale in California or sold any of my designs in California" was false because of two e-mails produced suggesting that Silverman visited California on one occasion in 2014 and discussed her products with at least two boutiques. Yee Decl. Ex. 24, California Declaration, at ¶ 4; Ex. 25, 3/27/14 e-mail; Ex. 26, 3/19/14 e-mail. There is no evidence,

9

however, that Plaintiffs sold any products in California at the time of her statement, nor that Silverman made a formal offer of sale to the boutiques. Rather, the meetings seemed preliminary, as Plaintiffs had not even settled on a permanent manufacturer, and one boutique owner advised Silverman to manufacture her shoes in Italy and meet a certain shoe agent there. USPTO Silverman Decl., Yee Decl. Ex. 28, at ¶ 12. That owner did not purchase shoes from Plaintiffs until 2016. *Id.* at ¶¶ 26-27; Silverman Dep., Yee Decl. Ex. 17, at 67:1-20. In any event, contrary to AGL's suggestion, disclosure of this meeting likely would not have prevented the California Court from dismissing the action. *See World-Wide Volkwagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (declining to find personal jurisdiction over corporation based on "one, isolated occurrence" of its product entering state). AGL's complaints about discrepancies in witness declarations submitted in this action are similarly immaterial, such as its complaint that one witness's declaration stated that she previously referred to the accused shoes as a "knock off" and then later testified in a deposition that she did not recall using that term. *See* Morgillo Dep., Yee Decl. Ex. 23, at 39:19-22; Morgillo Aff., Yee Decl. Ex. 29, at ¶ 6.

Ultimately, even if Plaintiffs committed litigation misconduct, the Court declines to award attorneys' fees because both sides are at fault for unnecessarily prolonging this case. As Plaintiffs' counsel admitted in September 2016, Plaintiffs decided to dismiss their amended complaint because it made no sense to "proceed with hundreds of thousands of dollars in lawyers fees for $35,000 worth of sales." 9/29/16 Conf. Tr. at 2:16-23. Plaintiffs contend that AGL refused to respond to requests for sales figures, and that Plaintiffs did not know that AGL made only $35,000 in sales of the accused shoes until AGL's counsel made such an estimate during a conference in June 2016 and Giusti confirmed the number in a deposition in August 2016. AGL, however, produced sales invoices in September of 2015, from which Plaintiffs could have

calculated the total amount in sales for the accused shoes or requested assistance to do so. *See* Invoices, Pl.'s Ex. 30; 9/29/16 Conf. Tr. 4:9-15. Their failure to do so contributed to the unnecessary extension in litigation.

But AGL is not blameless either, as its production contained many invoices that were in Italian and referred to multiple products. *See* Invoices, Pl.'s Ex. 30. It should have been foreseeable that Plaintiffs would have difficulty deciphering them. Moreover, if AGL knew that its sales of the accused products totaled $35,000, it should have realized that the case would be worth far less than the hundreds of thousands of dollars in attorneys' fees both sides would incur if the litigation continued. Indeed, AGL now requests almost $2 million in attorneys' fees. AGL Fee Mem., Dkt. 105, at 24. Instead of incurring fees while waiting for Plaintiffs to decipher the invoices, AGL could have disclosed the low sales figures to Plaintiffs in an effort to end the litigation early. Because each side's actions contributed to the protracted litigation, the Court is not inclined to award fees. *Cf. Omega SA v. 375 Canal, LLC*, 324 F.R.D. 47, 54 (S.D.N.Y. 2018) (Crotty, J.) (holding that "[t]he carelessness of both parties suggests that sanctions are not required" where plaintiffs' counsel submitted a declaration containing statements contradicting an attached exhibit and defendant's counsel failed to bring discrepancy to the Court's attention until eve of trial). Accordingly, both parties' motions for attorneys' fees are denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion is granted in part as to summary judgment, and all other motions are denied. The Clerk of Court is directed to terminate all pending motions and close the case.

Dated: New York, New York
      September 11, 2018

SO ORDERED

*/s/ Paul A. Crotty*

PAUL A. CROTTY
United States District Judge